**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 37557**

| | |
|---|---|
| IN THE MATTER OF JANE DOE, A CHILD UNDER EIGHTEEN YEARS OF AGE. ) ) ) | |
| IDAHO DEPARTMENT OF HEALTH & WELFARE, ) ) | 2010 Unpublished Opinion No. 587 |
| ) | Filed: August 10, 2010 |
| Plaintiff-Respondent, ) ) | Stephen W. Kenyon, Clerk |
| v. ) ) | |
| JANE DOE I, ) ) ) | THIS IS AN UNPUBLISHED OPINION AND SHALL NOT BE CITED AS AUTHORITY |
| Defendant-Appellant. ) ) | |

Appeal from the Magistrate Division of the District Court of the Seventh Judicial District, State of Idaho, Bonneville County. Hon. Linda J. Cook, Magistrate.

Decree terminating parental rights, <u>affirmed</u>.

James H. Barrett, Jr., Bonneville County Public Defender; Scott J. Davis, Deputy Public Defender, Idaho Falls, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Mark V. Withers, Deputy Attorney General, Boise, for respondent.

---

GUTIERREZ, Judge

Jane Doe I (Doe) appeals from the magistrate's decree terminating Doe's parental rights as to her daughter, Jane Doe (B.F.). For the reasons set forth below, we affirm.

## I.

## FACTS AND PROCEDURE

On December 29, 2006, Doe's two older daughters, E. and K., were removed from Doe's home due to law enforcement's declaration of imminent danger after officers found evidence of drug use, unsanitary conditions and other problems, and Doe and the other adults present in the residence were arrested or cited. Specifically, Doe was arrested for possession of marijuana, possession of drug paraphernalia, injury to a child, and obstructing police. On November 23,

2007, while E. and K. were still in shelter care, Doe gave birth to B.F., the subject of this appeal.[1] Several days later, on November 28, the Idaho Department of Health and Welfare (Department) filed a petition under the Child Protection Act, asserting that B.F. and her sisters were abandoned, abused, neglected, homeless, lacked a stable home, and came within the magistrate's jurisdiction because they were residing in a household in which they were exposed to or were at risk of being victims of abuse, neglect, or abandonment.

In conjunction with the petition, a motion to remove B.F. and a motion to approve an extended home visit for her were filed. The Department requested that the proposed extended home visit, leaving B.F. to live with Doe, be subject to certain terms and conditions, including that Doe report weekly to her probation officer and follow the rules applicable to her probation, that she submit to random drug testing, obtain and maintain employment and independent housing, take her medication as prescribed, take a parenting class and be able to apply the information she learned to provide B.F. with proper care, obtain counseling, and successfully participate in drug and alcohol treatment. The court ordered legal custody be vested with the Department and that B.F. be placed in the physical custody of Doe for an extended home visit.

On December 13, 2007, a permanency hearing report was filed, stating that Doe had made a "slow start" in working on the case plan applicable to E. and K. so that they could be returned to her, but that the Department hoped it would be possible to return the children to her in approximately five months. It was also noted that Doe was required to continue participating in dual-diagnosis programs and to learn to manage her bipolar diagnosis without the use of illegal drugs.

On December 18, an adjudicatory hearing was held in regard to B.F., after which the magistrate approved the proposed case plan and issued an order, placing B.F. under the protective supervision of the Department, but physically leaving her with Doe. A case plan hearing was held on January 17, 2008, after which the magistrate issued an order allowing Doe to continue to provide care for B.F. in her home. Doe was required to continue participating in specific treatment and counseling, and refraining from using illegal drugs.

---

[1] Doe was never married to B.F.'s father and their relationship ended shortly after the pregnancy occurred. He never developed a relationship with B.F., did not provide for her support or care, and eventually signed a voluntary consent to terminate his parental rights as to her. His parental rights were terminated by court order on November 13, 2008.

In May 2008, the Department and the guardian ad litem (CASA volunteer) filed reports stating that conditions in Doe's home were not appropriate for an infant. Aggressive pit bulls remained in the residence, the electricity had been turned off, and Doe was being evicted and had been unable to hold a job or provide a stable living environment for herself or B.F. At a subsequent review hearing, the magistrate found that it would be contrary to B.F.'s welfare to remain in Doe's house and an order was issued removing B.F. from her mother's physical custody. B.F. was placed in foster care, where she remains. Doe has been allowed visits.

A review hearing order was filed on December 1, 2008, which acknowledged that Doe had been discharged from probation and had completed a parenting class, but retained B.F. in the Department's legal custody. Several weeks later, both CASA and the Department submitted reports recommending the termination of Doe's parental rights.

On January 15, a petition to terminate the parental rights of Doe as to her three daughters was filed. On May 15, Doe voluntarily consented to the termination of her parental rights as to E. and K. The order effecting the termination was issued several days later on May 21.

A trial was held as to the termination of Doe's parental rights in regard to B.F., which lasted three days. Upon its conclusion, the magistrate issued findings of fact, conclusions of law, and decree terminating Doe's parental rights in regard to B.F.

Doe appeals the magistrate's termination of her parental rights as to B.F.

## II.

## ANALYSIS

On appeal, Doe contends that the magistrate's decision to terminate the parent-child relationship between her and B.F. on the grounds of abandonment and neglect was not supported by clear and convincing evidence.

In a proceeding to terminate a parent-child relationship, the Due Process Clause mandates that grounds for termination must be shown by clear and convincing evidence. *State, Dep't of Health & Welfare v. Roe*, 139 Idaho 18, 21, 72 P.3d 858, 861 (2003); *In re Baby Doe*, 130 Idaho 47, 53, 936 P.2d 690, 696 (Ct. App. 1997); *In re Cheatwood*, 108 Idaho 218, 219, 697 P.2d 1232, 1233 (Ct. App. 1985). When the trial court finds that the grounds as defined by statute, which are alleged for termination, are established by clear and convincing evidence, those findings will not be overturned on appeal unless they are clearly erroneous. *In re Baby Doe*, 130 Idaho at 53, 936 P.2d at 696; *In re Crum*, 111 Idaho 407, 408, 725 P.2d 112, 113 (1986). Clear error, in turn,

3

will not be deemed to exist where the findings are supported by substantial and competent, albeit conflicting evidence. *Id*. It is for the trial court to determine whether clear and convincing evidence supported the termination of parental rights; our task on this appeal is to determine whether the trial court's finding is clearly erroneous. *Id*. at 409, 725 P.2d at 114. Furthermore, in reviewing such findings, this Court will indulge all reasonable inferences in support of the trial court's judgment. *In re Aragon*, 120 Idaho 606, 608, 818 P.2d 310, 312 (1991); *In re Baby Doe*, 130 Idaho at 53, 936 P.2d at 696.

Idaho Code Section 16-2005 permits the Department to petition the court for termination of the parent-child relationship when it is in the child's best interest and any one of the following five factors exist: (a) abandonment; (b) neglect or abuse; (c) lack of a biological relationship between the child and a presumptive parent; (d) the parent is unable to discharge parental responsibilities for a prolonged period which will be injurious to the health, morals, or well-being of the child; or (e) the parent is incarcerated and will remain incarcerated for a substantial period of time. Each statutory ground is an independent basis for termination. *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007).

Idaho Code Section 16-2002(3) defines "neglect" in two ways--the conduct defined in I.C. § 16-1602(25) (discussed below), as well as situations where the "parent(s) has failed to comply with the court's orders in a child protective act case or the case plan, and reunification of the child with his or her parent(s) has not occurred within the time standards set forth in section 16-1629(9)." The time standard established by I.C. § 16-1629(9) is defined as when "a child is placed in the custody of the department and was also placed in out of the home care for a period not less than fifteen (15) out of the last twenty-two (22) months from the date the child entered shelter care." In pertinent part, I.C. § 16-1602(25) defines "neglected" as a child:

> (a) Who is without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parents . . . or their neglect or refusal to provide them . . .; or
> (b) Whose parents . . . are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being . . . ."

Idaho Code § 16-1602(2) defines "abandoned" as follows:

> [T]he failure of the parent to maintain a normal parental relationship with his child including, but not limited to, reasonable support or regular personal contact.

Failure to maintain this relationship without just cause for a period of one (1) year shall constitute prima facie evidence of abandonment.

In regard to the magistrate's finding of neglect, Doe alleges the magistrate relied on several improper bases. First, she contends that the magistrate erred when it found that she was "too immature" to discharge her parental responsibilities. Specifically, Doe argues that this finding was based on a "subjective judgment based upon arbitrary standards set by [Department] workers." She contends that evidence criticizing Doe's parental style, her juvenile humor, her poor attitude, and her unusual methods of discipline does not clearly convince a reasonable and open mind that Doe had an inability to care for her children.

As the Department points out, Doe's immaturity was but one of a host of factors the magistrate took into account in determining the appropriateness of terminating her parental rights for neglect; it did not, as Doe seems to assert on appeal, terminate her parental rights based solely on its conclusion that she was too "immature" to discharge her parental responsibilities. And to the extent that the magistrate concluded that she was immature and took this into account in deciding to terminate her parental rights, such a finding was based on much more than subjective evaluations of Doe's demeanor and parenting style, as Doe asserts, but on concrete and extensive evidence regarding Doe's actions, the relationships she maintained, the environment in which she kept her children, and the effect of her parenting on the development of B.F. Most importantly, there was substantial and competent evidence to support findings that Doe did not possess the requisite parenting skills to adequately care for B.F.--whether based on immaturity or other deficiencies. When B.F. was physically removed from Doe's care she was "stinky," dressed inappropriately for the season, had a flat affect, would not interact with others and did not want to be held, had a "glaze" in her eyes, was exhausted and dehydrated, would not eat, preferred to lay on the floor without smiling, laughing, or giggling, and was very afraid of men. She was also suffering from cradle cap, a flattened head, and a painful diaper rash and had not reached normal developmental milestones. In addition, Doe was never able to demonstrate that she was able to execute the necessary parenting skills to safely care for B.F. even after receiving extensive parental skills training. During visits with B.F., after the infant had been placed in shelter care, Doe demonstrated a continual lack of understanding as to the appropriate foods to feed a baby (feeding her food that was a choking hazard or was too hot), how to interact with her (by often failing to interact with her on visits, by yelling at her to do something, or by

physically holding her down and attempting to force her to eat even when B.F. was not interested), how to bond with her, how to handle her safely (by not recognizing that some foods present a choking hazard, the cleanliness standards that must be maintained in a home, and that aggressive pit bulls are not appropriate to have in the house with an infant), and how to change her diaper in a timely and correct manner. In this same vein, Doe was clinically diagnosed as not having the necessary level of awareness or insight into how her judgment and actions affect the safety and general well-being of her children or the necessary problem-solving skills for parenting. Doe also did not demonstrate that she could support herself and B.F. without significant, ongoing assistance from outside resources. In this regard, we conclude that the magistrate did not err in concluding that Doe was "immature"--as there was substantial and competent evidence to support the finding--and in taking this into account when deciding whether to terminate Doe's parental rights as the behavior underlying the finding of immaturity was relevant to determining whether termination was appropriate for neglect.

Doe also contends that the magistrate erred in finding that the potential for neglect justified the termination of her parental rights. Specifically, she argues that the court's finding of potential neglect "seems to be based upon the fact that Jane Doe had prior mental health issues and that a reptile had been killed [by dogs] in the home. However, there was no finding of past harm to the minor child nor any finding of imminent danger."

It is well-settled that a magistrate may consider a parent's past conduct in determining whether the parent would be a neglectful parent at the present time and *in the future*. *In re Dayley*, 112 Idaho 522, 525, 733 P.2d 743, 746 (1987). In addition, nothing in the statutory definition of "neglect" suggests that a child must suffer demonstrable harm before the parent-child relationship can be terminated. *Doe v. Roe*, 133 Idaho 805, 808, 992 P.3d 1205, 1208 (1999).

To the extent that Doe contends that the magistrate's finding of potential harm to B.F. is based solely on Doe's prior mental health issues and the fact that a reptile had been killed in B.F.'s crib, Doe is incorrect. Even a cursory reading of the magistrate's findings of fact indicates that the magistrate based its decision on numerous factors and evidence. This evidence supports the magistrate's determination that Doe likely would continue to neglect B.F. and this was a factor weighing against maintenance of her parental rights. *See Idaho Dep't of Health and Welfare v. Doe*, ___ Idaho ___, ___ P.3d ___ (April 30, 2010) (affirming the termination of

6

mother's parental rights where there was evidence that cognitive limitations and psychiatric problems, among other things, had prevented her from acquiring the requisite parenting skills and there was indication that her inability to parent would continue for a prolonged indeterminate time despite significant assistance from the state).

Doe further contends that the magistrate erred in finding that the voluntary termination of her parental rights as to her older children was evidence of her inability to care for her infant daughter. However, there is no indication in the magistrate's decision that the court used this as a factor or basis for it's termination of Doe's parental rights with respect to B.F. As the Department points out, the magistrate did make reference to E. and K., but in the context of Doe's parenting skills--which were certainly relevant to the issue at hand. And while the court did make a passing reference to the fact that her parental rights had been voluntarily terminated as to them, there is no indication that the magistrate relied on this fact in determining whether to terminate her rights as to B.F. Accordingly, Doe's contention that the magistrate erred in this regard is without merit.

Doe also argues that it was error for the magistrate to find that her "collateral choices"--including the fact that she does not have an Idaho driver's license, the frequency of her sexual encounters, and her association with individuals with prior criminal records--was evidence that termination of her parental rights was appropriate.

In regard to her lack of a driver's license, it is clear from the magistrate's findings that it did not use this fact against her. The court specifically stated that:

> At trial, much emphasis was placed on the fact that [Doe] did not obtain a drivers [sic] license, which was a case plan goal. She has managed to arrange transportation most of the time. Also, with her limited financial resources it would be difficult for her to maintain a vehicle and provide insurance for it. That [Doe] does not have a drivers [sic] license is *not a concern to the court*.

(emphasis added). Thus, Doe's assignment of error in this regard has no merit.

Pertaining to the frequency of her sexual encounters, Doe argues that "simply because a woman is of sexual morals which do not please a conservative Christian person nor fit within a conservative religious community does not mean that the woman cannot be an effective parent" and that this factor should not have been considered by the court or used as a ground for terminating Doe's parental rights. The court's only reference to this issue appears to be its statement that:

7

[A substance abuse counselor] also stated that [Doe] told him she had sex 72 out of the past 90 days. While the Court has no prurient interest in her private life, the statements are indicative that [Doe's] judgment--as reflected in behavior, social interaction, and in her statements--is not adequate for good parenting.

Read in context, it is clear that this finding was a very small part of the evidence considered by the magistrate in deciding that termination was in B.F.'s best interests. As we discussed above, there were many overarching reasons behind the termination--the most glaring of which was the condition of B.F. when she was taken from her mother's care and Doe's inability or unwillingness to acquire the skills and resources to satisfactorily care for a young child. The magistrate did not, as Doe attempts to argue here, find that Doe was unfit to parent based "simply" on her sexual proclivity (real or proclaimed), but appropriately considered it as a factor in evaluating Doe's judgment as it related to her ability to parent.

Nor did the magistrate err in considering her association with persons with prior criminal records. For counsel to argue that such behavior has no bearing on a person's ability to parent-- and, more specifically, on their judgment and decision-making skills--borders on absurdity.

Last, Doe contends that the trial court erred in determining that her failure to pay child support constituted willful abandonment. Specifically, she contends that the trial court failed to take into consideration whether Doe had the ability to pay the child support assessed her. However, having found there was substantial and competent evidence to affirm the magistrate court's termination of Doe's parental rights pursuant to I.C. § 16-2005(1)(b) due to her neglect of B.F., we need not address whether there was also sufficient evidence to affirm the magistrate's finding regarding the alternative ground of abandonment. *See Dep't of Health & Welfare v. Doe*, ____ Idaho ____, ___ P.3d ___ (May 28, 2010) (holding that an appellate court may decline to address remaining issues if a case is properly dispensed with on alternative grounds). [2]

---

[2]     At oral argument before this Court, counsel for Doe advanced the argument that the state was required to provide a level of ongoing assistance to Doe that would allow her to retain her parental rights as to B.F. He did not cite any authority for this proposition, nor are we aware of any. We also note that even when Doe was receiving extensive assistance from the state, she still was unable to demonstrate the ability to care for B.F. *See Idaho Dep't of Health & Welfare v. Doe*, ___ Idaho ___, ___ P.3d ___ (April 30, 2010) (in affirming the termination of mother's parental rights, noting that mother had received extensive state services and had not pointed to any supportive services that would enable her to carry out the responsibilities of parenting children in light of her personal limitations).

8

**III.**

**CONCLUSION**

We conclude that there was substantial, competent evidence for the magistrate to find that Doe neglected B.F. and that termination of Doe's parental rights was in the best interest of B.F. For this reason, we need not reach the issue of whether the court erred in finding that Doe abandoned B.F. by not paying child support. Therefore, the magistrate's decree terminating Doe's parental rights is affirmed. No costs or attorney fees are awarded on appeal.

Chief Judge LANSING and Judge MELANSON, CONCUR.